### In re J. BACON & SONS.

(District Court, W. D. Kentucky. June 26, 1915.)

1. BANKRUPTCY ⬦⟶223—COMPENSATION OF REFEREE—COMMISSIONS.
   A referee is not entitled to commissions on money paid out by a trustee in conducting the business of the bankrupt.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 888–894; Dec. Dig. ⬦⟶223.]

2. BANKRUPTCY ⬦⟶223—COMMISSIONS OF REFEREE—DISBURSEMENTS FOR RENT.
   Where a trustee at the request of the creditors continued the mercantile business of the bankrupt, from that time forward the rent of the business premises was an expense of the business, and the referee is not entitled to commissions on the disbursements therefor; but rent accruing before that time, for which a lien was given by the state statute, was an indebtedness of the estate.
   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 888–894; Dec. Dig. ⬦⟶223.]

3. BANKRUPTCY ⬦⟶223—COMMISSIONS OF REFEREE—COMPOSITION.
   The majority of creditors of a bankrupt joined in acceptance of an offered composition, and in such acceptance waived deposit in court of the amount offered, and only such amount was deposited as necessary to cover costs, disbursements, and claims of creditors who did not join in the waiver. The composition was confirmed, but in the meantime the term of the referee had expired, and a successor had been appointed. *Held*, that under Bankr. Act 1898, c. 541, § 40a, 30 Stat. 556 (Comp. St. 1913, § 9624), which provides that referees, shall receive as commissions "one-half of one per .centum on the amount to be paid to creditors upon the confirmation of a composition,"· commissions were allowable only on the amount actually paid in and disbursed in the bankruptcy proceedings, and that such

commissions were payable to the succeeding referee, whose appointment took effect prior to the confirmation or to any disbursement of the fund.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 888–894; Dec. Dig. ☞223.]

In Bankruptcy. In the matter of J. Bacon & Sons, a corporation, bankrupt. On settlement of compensation of referee.

Herman Nettelroth, of Louisville, Ky., for former referee.

Wm. Marshall Bullitt and Clarence Smith, both of Louisville, Ky., for bankrupt.

EVANS, District Judge. The corporation known as the H. B. Claflin Company, which conducted a vast mercantile business in New York City early in 1914, became embarrassed. Connected with it in various ways were 23 other corporations, located some in New York City and others in different parts of the country. Among these corporations was the bankrupt, J. Bacon & Sons. Against it, on June 26, 1914, certain of its creditors filed a petition in involuntary bankruptcy, and on July 13th it was adjudicated a bankrupt. Its capital stock was owned or controlled by the H. B. Claflin Company, and most of its indebtedness was incurred on account of that corporation. Its indebtedness amounted, approximately, to $2,400,000, very little of which was owing to creditors in this locality. The affairs of the bankrupt were controlled in New York by the owner of its capital stock. Its local manager in Louisville, Ky., was A. H. Morris. Upon the adjudication the case was referred to the then referee, R. C. Kinkead, Esq., who on July 14, 1914, in the absence of the judge, appointed said Morris receiver of the bankrupt. On August 3d the first meeting of creditors was held, and thereat Morris was elected trustee, and upon his qualification was, at the request of creditors, authorized to continue the business of the corporation as a going concern, and this was done until April 26, 1915, when it terminated under the circumstances presently to be stated. The indebtedness of the 23 corporations associated with the H. B. Claflin Company was enormous, amounting to scores of millions of dollars, and the creditors of the allied 24 corporations appointed what was called a noteholders' committee in New York City, where the greater part of the entire indebtedness was held or controlled; the functions of the committee being to effect, if possible, a general settlement for all. While this was being done, the business of the bankrupt was conducted by the trustee, and Mr. Kinkead, in his petition for compensation filed May 19, 1915, says that during the entire period between July 13, 1914, and March 30, 1915, when his term of office expired, he—

"was required to and did perform services as referee in said matter almost daily, with the exception of Sundays and a few days when the undersigned was absent from said district; that the aforesaid services by the undersigned, as referee, were required by reason of the fact that the conduct of the business of said bankrupt was being continued pursuant to the request of the creditors of the bankrupt; that matters were continually arising in said proceeding which required action by the undersigned as referee; and that the undersigned, as referee, examined and countersigned approximately 6,000 checks, aggregating in amount about $900,000, which were drawn by said receiver or trus-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tee to pay the expenses of the conduct of said business during the aforesaid period."

The bankrupt's business was conducted by the trustee, and not by the referee, and the labors of the referee, as he has described them in his petition, while possibly necessary under the rule even while the business was being conducted as in this case, were not such as entitled him to any compensation. All the vast amount for which he signed checks was, as he shows, "to pay the expenses of the conduct of the business." This work was probably done in the hope that it would represent such a "distribution to creditors" as would entitle the referee to 1 per cent. upon the amount disbursed, but examining and countersigning the checks of the trustee is not such work as entitles the referee to compensation, as the act makes no provision for it in cases like this.

[1] Mr. Loveland, in his work on Bankruptcy (4th Ed.) on page 232, says:

"The referee is not entitled to commissions on moneys paid out by the trustee while carrying on the business of the bankrupt."

The text is supported by Bray v. Johnson, 166 Fed. 57, 91 C. C. A. 643, and by In re Rourke Co. (D. C.) 209 Fed. 877. Indeed, so definitely has this proposition been settled that no contention was made at the argument in support of the view that any compensation could be allowed for those services.

The schedules of the bankrupt, as amended, showed its total indebtedness to some 448 creditors to have been $2,356,441.27. Much of this indebtedness was upon the paper of the H. B. Claflin Company, and almost the entire amount was proved against the bankrupt's estate and allowed by the referee. Meantime, the noteholders' committee had progressed with its work, and on March 5, 1915, the bankrupt filed with the referee an offer of composition in the following language:

"The undersigned, which was adjudicated a bankrupt herein on the 13th day of July, 1914, and whose schedules of creditors and property have been previously filed at Louisville, Ky., with Hon. Robert C. Kinkead, Esquire, the referee in bankruptcy in charge, and who was examined herein on the 3d day of August, 1914, does hereby offer a composition at thirty-five per cent. (35%) of the claims of its creditors allowed, or to be allowed, except those entitled to priority in this proceeding.      J. Bacon & Sons,
      "By Will A. Jonas, President."

This offer was accepted in due form, and creditors whose claims were proved and allowed to the amount of $2,326,067.67, and who were represented by the noteholders' committee, accompanied their acceptance of the offer with a waiver in writing in this language:

"On behalf of said creditors named in the statement annexed hereto, said committee hereby waives the deposit to the credit of the Judge of the United States District Court for the Western District of Kentucky of the thirty-five per cent. (35%) composition offer made by said bankrupt so far as creditors' claims are concerned. This waiver, however, is absolute with respect to the deposit of money necessary to apply for the confirmation of said composition."

Other general creditors, whose claims had been proved and allowed, did not join in this waiver.

Before his term expired as referee, Mr. Kinkead wrote and signed his report on the offer of composition, in which he said:

"Your referee would respectfully further certify that there has been deposited to the credit of the judge of this court in the Citizens' National Bank of Louisville, Kentucky, the sum of $30,000, which it is estimated by your referee will not be sufficient to pay all costs, charges and expenses of administration, all preferred or prior claims, and the thirty-five per centum composition to all those creditors who have not waived the deposit thereof on their respective claims, but the bankrupt refuses to make further deposit. Your referee herewith hands up all proofs of claim mentioned in the various schedules attached hereto, together with all powers of attorney filed in connection therewith. Your referee would further certify that so far as he is advised, there is no reason appearing herein as to why said composition should not be confirmed."

Notwithstanding the suggestion of the referee as to the inadequacy of the $30,000 deposit, it was found to be quite sufficient.

The business of the bankrupt was conducted upon premises partly on Market street and partly on Fourth street, in this city. That part on Market street was owned by the Bacon Realty Company, and was leased by the bankrupt at a rental of $27,000 per annum, payable in monthly installments of $2.250 each, and that part of the premises located on Fourth street was owned by Miss Maggie Judge and was leased to the bankrupt at a rental of $3,600 per year, payable in monthly installments of $300 each. Morris, during his incumbency as receiver and trustee, paid all the rent accruing to each landlord from July 31, 1914, up to and including March 31, 1915. How, if ever, the rent was paid to the two landlords from July 13, 1914, when the adjudication was made, until July 31, 1914, is not clearly shown, nor is it clearly shown how the rent was paid from July 1 to July 12, 1914, inclusive, but we may assume that it was paid by the receiver, who, except for the first 12 days in July, was in charge of the bankrupt's affairs. Of course, the landlords respectively, under section 2317 of the Kentucky Statutes (construed in the case of Sapinsky & Son, 219 Fed. 57, 134 C. C. A. 595), had a lien upon the bankrupt's property on the premises to secure payment of the rent due and to become due for one year from the adjudication on July 13, 1914. As we have seen, the receiver and trustee paid the rent from July 31, 1914, to March 31, 1915, but the record shows that both of the landlords, in writing, waived any deposit to secure any balance accruing to them respectively from April 1, 1915, to July 13, 1915. That is to say, knowing, if the composition were confirmed, the business would be continued by the bankrupt, they deemed it good judgment to facilitate that result by the waiver. On March 29, 1915, the term of office of Referee R. C. Kinkead expired, and on the next day, March 30th, the appointment of George Du Relle, Esq., as his successor, became effective. On April 1st the case was referred to the latter referee. On the same day the court entered an order as follows:

"The bankrupt, J. Bacon & Sons, having been examined at a meeting of creditors, and having filed in court the schedules of its property and lists of its creditors required, offered terms of composition to its creditors, and this day came by counsel and made application for the confirmation of such composition; it is now ordered that said application be filed, it appearing that said proposition has been accepted in writing by a majority in number and value

of all creditors whose claims have been allowed, and it further appearing that the money to pay the consideration to be paid by the bankrupt to his creditors, and the costs of the proceeding has been deposited, pursuant to the order of the court now made, in the Citizens' National Bank of Louisville, Ky., subject to the order of the judge of this court. The court now fixes April 24, 1915, as the time, and Louisville, Ky., as the place, for hearing said application, and directs the clerk to give notice thereof at least ten days before said time to each creditor by mail."

On April 26th the court entered another order in this language:

"An application for the confirmation of the composition of the bankrupt having been filed in court, and it appearing that the composition has been accepted by a majority in number of creditors whose claims have been allowed, and also by a majority in amount and value of such allowed claims, and the consideration and the money required by law to be deposited having been deposited as ordered in such place as was designated by the judge of said court, and subject to his order, and it also appearing that it is for the best interest of the creditors and that the bankrupt has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to its discharge, and its offer and its acceptance are in good faith, and have not been made or produced by any means, promises, or acts contrary to the acts of Congress relating to bankruptcy, it is therefore hereby ordered that the composition be, and it is hereby, confirmed. That orders should be made for the proper distribution of the fund so deposited will be considered at some future time."

Accompanying the report of Referee Kinkead on the offer of composition was the following:

### Statement of Referee's Charges.

| | | |
|---|---:|---:|
| Expenses necessarily incurred and paid by referee for mailing notices to creditors, printing notices, clerical aid in certifying composition, etc., office accommodation and stationery, 9 months..............$ | 186 | 55 |
| Examining, filing and registering 607 claims of creditors at 25 cents | 151 | 75 |
| To 1 per cent. on taxes paid, not covered by composition............ | 7 | 10 |
| To 1 per cent. on $27,000 paid and to be paid on Market Street house, rent for one year due and to become due........................ | 270 | 00 |
| To 1 per cent. on $3,600 paid and to be paid on Fourth Avenue annex, rent for one year due and to become due...................... | 36 | 00 |
| To 1 per cent. on claim (secured of Monarch Tag Co.)............... | 2 | 00 |
| To 1 per cent. on wage claims (secured) to be paid................. | 8 | 58 |
| To one half of 1 per cent. upon the amount to be paid creditors on confirmation of composition, being $831,870.40.................... | 4,159 | 35 |
| | $4,821 | 33 |
| Credit by amount paid by Trustee on account................... | 500 | 00 |
| Balance ...............................................$4,321 | | 33 |

None of those charges were objected to, except those which will be repeated, and which are as respectively stated, thus:

| | | |
|---|---:|---:|
| To 1 per cent. on $27,000 paid and to be paid on Market Street house, rent for one year due and to become due.......................$ | 270 | 00 |
| To 1 per cent. on $3,600 paid and to be paid on Fourth Avenue annex, rent for one year due and to become due.................. | 36 | 00 |
| To one half of 1 per cent. upon the amount to be paid creditors on confirmation of composition, being $831,870.40.................... | 4,159 | 35 |

The five items in the referee's "Statement of Charges," to which no objection has been made, were for fees earned upon the work done during the period from July 13, 1914, to March 29, 1915, both inclusive,

and in the aggregate amounted to $355.98. On some date not shown, the trustee paid Mr. Kinkead $500, which was an excess over the undisputed items of $144.02. This payment, to the extent of fees not then earned, was not warranted.

[2] The rent of the premises upon which the bankrupt's business was carried on was at the rate of $2,550 per month. The trustee, at the request of creditors, was ordered by the referee to continue the business of the bankrupt. This appears to have been done on August 3, 1914. On and after that date we think the rent of the premises must be regarded as part of the expense of carrying on the business (In re Grignard Lithographic Co. [D. C.] 155 Fed. 699), and upon disbursements for such expenses the referee was not entitled to compensation, as shown by the authorities already cited. But for the month of July, 1914, and for the first two days of August following, we think the rent was an "indebtedness," and that, upon the amount disbursed for its payment, the referee was entitled to 1 per cent. In re Youdelman, etc., Co. (D. C.) 166 Fed. 381. The amount of the rent for this period of one month and two days was $2,715, and upon the disbursement of that sum the referee was entitled to $27.15. This will reduce the excess payment to $116.87.

[3] So far as applicable to the questions now involved, section 40a of the Bankruptcy Act is as follows:

"Referees shall receive as full compensation for their services, payable after they are rendered, * * * from estates which have been administered before them one per centum commissions on all moneys disbursed to creditors by the Trustee, or one-half of one per centum on the amount to be paid to creditors upon the confirmation of a composition."

Section 72 (Comp. St. 1913, § 9656) is expressed in these unmistakable terms, to wit:

"Neither the referee, receiver, marshal, nor trustee shall in any form or guise receive, nor shall the court allow him, any other or further compensation for his services than that expressly authorized and prescribed in this act."

The language is too plain and unambiguous to admit of construction. Bearing that in mind, then, in order to ascertain precisely what the two referees in this case are entitled to receive on the percentage basis, we must look to that clause of section 40a, which allows referees one-half of 1 per cent. "on the amount to be paid to creditors upon the confirmation of a composition." When this language is analyzed, two elements are prominent and unmistakable. They are: First, that the one-half of 1 per cent. is to be calculated "on the amount to be paid to creditors"; and, second, that the payments contemplated are those to be made "upon the confirmation of a composition." The language used is, on its face, plain enough, but the record develops a latent ambiguity which may be stated thus: Does the phrase "to be paid to creditors" refer to what was "offered" in composition, disregarding all ad interim happenings, or does it refer to what is actually to be paid to creditors as the status of the case is fixed when the composition is confirmed? In this case the creditors accepted the terms of composition offered, but a great majority of them voluntarily waived the pay-

224 F.—49

ment of the 35 per cent. through this proceeding, and, with these facts in the record, the referee reported favorably and the court confirmed the composition with the waivers referred to standing against the creditors who had accepted the terms offered with the waiver voluntarily annexed thereto by themselves. In this situation we do not doubt that section 40a must be so construed in this case as to limit the phrase "to be paid to creditors" to those who had the right, upon the confirmation of the composition, to claim payment out of the money provided for that purpose through the deposit of the $30,000. The record inexorably fixed that sum as the amount to be paid to creditors through this proceeding, and we can have no concern with and cannot control what, if anything, may be done outside. The exact question, therefore, is: What amount was to be "paid to creditors" in this case on April 26, 1915, when the composition was confirmed? Can there be any doubt upon the record as to the exact amount to be then so paid? The facts are clear and indisputable that upon the confirmation of the composition in this case on April 26, 1915, no more than $30,000 was to be then paid to creditors. Certainly nothing else was to be paid through or in this proceeding, because of the waivers referred to. There can, we think, be no doubt of the right of the creditors to make the waiver, and there can be as little doubt that their doing so was a question with which the referee had no concern. We cannot doubt that it was the intention of Congress that the compensation of the referee was to be based upon certain work to be done by him. The late referee did no work, was not properly called upon to do any, and could not have done any in respect to paying creditors even to the extent of the $30,-000 deposited, which was not to be paid until after he went out of office. For paying out the $30,000 the present referee is entitled to the one-half of 1 per cent. prescribed in the statute. But it does not, and, in our opinion, cannot, follow, because he is entitled to one-half of 1 per cent. on that sum, that either he or his predecessor is entitled to a like percentage upon 35 per cent. of $2,326,067.67, not one cent of which was to be paid to the creditors holding those claims either upon the confirmation of the composition, or at all, so far as we know. They took charge themselves of that part of what concerned them alone. Certainly no payment is to be made to them in this proceeding which closed when the composition was confirmed. Under the statute the referee's compensation is to be measured by work actually done, though Congress probably considered as a meritorious factor the responsibility attaching to the custody, for a time, of the money as well as the work of paying it out, but the referee has no just or lawful claim to be paid any percentage upon purely imaginary disbursements. Section 40a seems to us not to admit of any other construction, unless we interpolate words into it and entirely disregard the remarkably positive and explicit prohibitions of section 72. We disclaim the right to do either of those things.

Though the question before us has never, so far as we can find, been adjudicated, the case of In re Philips, 210 Fed. 889, 127 C. C. A. 499, is quite instructive. See, also, In re Meadows, 211 Fed. 948, 128 C. C. A. 446.

Counsel for the late referee seems to attach some importance to the proposition that the offer of composition was absolute in its terms; that it was to pay 35 per cent. upon the general indebtedness; and that the composition, though confirmed, cannot release the bankrupt from its debts, unless that payment is actually made; and hence he claims that the full amount of the percentage on the debts proved should be allowed. He quotes section 14c of the act (Comp. St. 1913, § 9598) to the effect that:

"Confirmation of a composition shall discharge the bankrupt from his debts, other than those agreed to be paid by the terms of the composition and those not affected by a discharge."

As between the bankrupt and its creditors, these matters might have more or less importance in certain contingencies, but, as already stated, we cannot see how they in any way entitle the referee to charge fees assessed at one-half of 1 per cent. upon sums which the creditors possibly might claim from the bankrupt, but which they are not doing in fact. What they may do hereafter is their concern, not ours. But if, under the specious guise of speculation as to the possibilities of payment in the future, the court were to allow the items here in contest, it would disregard section 72, which contains one of the most positively expressed provisions found in the Bankruptcy Act.

After very careful consideration, we are constrained to hold that the former referee, Mr. Kinkead, is entitled only to $27.15 in excess of the amount of the five items on his "statement of charges" which are not disputed. This $27.15 has already been paid to him; that is to say, the fees he has earned in the case, including the $27.15, amount to the aggregate of only $383.13, while he has been paid $500 by the trustee out of the assets of the bankrupt. Referee Du Relle, however, who has made or will make the distribution of the entire $30,000 deposited by the bankrupt, is entitled to one-half of 1 per cent. on that sum, inasmuch as it is to be paid "on the confirmation of the composition." The former referee is not entitled to any of the percentage thus to be paid, unless, as stated at the hearing, there has been some arrangement between the two referees whereby they have apportioned the fees in the case without calling on the court to do so under section 40b of the act.

Because of what occurred at the hearing, and what appeared to be the desire of all concerned, we have once for all considered and determined the questions involved, though, if Referee Du Relle desires a further hearing upon the main question in issue, he will be accorded the opportunity. Otherwise orders will be entered in conformity with the views herein expressed.